UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Harleysville Insurance Company,                           Civil No. 10-2591 (DWF/AJB)

          Plaintiff,

v.                                                         **MEMORANDUM**
                                                                 **OPINION AND ORDER**
Physical Distribution Services, Inc.
d/b/a Labor Services Company;
Miller Transporters, Inc.; and
Jonathan Hughes,

          Defendants.

_____

Andrea E. Reisbord, Esq., and Tamara L. Novotny, Esq., Cousineau McGuire Chartered, counsel for Plaintiff.

Alyson M. Palmer, Esq., and Donald Chance Mark, Jr., Esq., Fafinski Mark & Johnson, PA, and Charles A. Delbridge, Esq., and Joseph J. Christensen, Esq., Christensen & Laue, P.A., counsel for Defendant Physical Distribution Services, Inc.

Thomas G. Drennan, Esq., Tressler LLP, and Robert E. Salmon, Esq., Meagher & Geer, PLLP, counsel for Defendant Miller Transporters, Inc.

Jonathan Hughes, Defendant, *Pro Se*.

_____

**INTRODUCTION**

      This matter is before the Court on Plaintiff Harleysville Insurance Company's

("Harleysville") Motion for Summary Judgment (Doc. No. 27), Motion for Summary

Judgment of Defendant Physical Distribution Services, Inc., d/b/a Labor Services

Company ("PDSI") (Doc. No. 31), and Defendant Miller Transporters, Inc.'s ("Miller") Motion for Summary Judgment (Doc. No. 35). For the reasons set forth below, the Court grants Defendants' motions in part and denies Plaintiff's motion.

## BACKGROUND

A.  **Agreement Between Miller and PDSI**

On May 26, 1989, PDSI and Miller entered into an agreement (the "Agreement") pursuant to which PDSI agreed to provide employee-leasing services to Miller. (Doc. No. 38, Bagwell Aff., Ex. 1 ("Agreement").) Paragraph 7 of the Agreement states:

> This agreement shall be effective on the date first shown above [May 26, 1989] and shall be for a period of one year. This contract may be terminated by either party, for cause, by thirty (30) days written notice to the other. This agreement may be terminated by either party without cause upon ninety (90) days written notice.

(*Id.* ¶ 7.) By its terms, the Agreement was to expire on May 26, 1990. (*See id.*) Miller and PDSI have continued to work together, however, and agree that the Agreement has continued to govern their relationship. (*See* Doc. No. 30, Resibord Aff. ¶ 7, Ex. F and Doc. No. 40, Drennan Decl. ¶ 2, Ex. 3 ("Robison Dep.") at 24; Doc. No. 34, Delbridge Aff. ¶ 6, Ex. 5 ("Olson Dep.") at 22-25; *see also* Doc. No. 10 ("Miller's Answer") ¶ 15.)

The Agreement also contains an indemnity provision. (*See* Agreement ¶ 5.) Paragraph 5 of the Agreement states, in relevant part:

> [PDSI] hereby indemnifies and saves MILLER harmless from any and all claims, actions or causes of action in any way relating to personnel assigned to MILLER, including, but not limited to, personal injury, workers compensation, third party claims, Social Security, unemployment compensation, and taxes or other required withholding of whatever nature. [PDSI] shall obtain insurance against any and all of the above mentioned

>risks and shall name MILLER as an additional insured requiring that at least fifteen (15) days notice be given to Miller of any change in coverage or any anticipated cancellation of said policy(ies). [PDSI] shall provide MILLER with certificates of insurance necessary to demonstrate compliance with these obligations.

(*Id.*)

**B.     PDSI's Harleysville Insurance Policy**

Between December 1, 2006 and December 1, 2007, PDSI was insured by Harleysville under a general commercial liability policy (Policy No. MPA 8J3876) (the "Policy"). (*See, e.g.*, Drennan Decl. ¶ 4, Ex. 5 ("Policy").) The Policy has a per-occurrence limit of $1,000,000. (Policy.) The Policy does not list Miller as a named insured. (*Id.*) The Policy provides the following coverage:

>1. Insuring Agreement
>a. [Harleysville] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Harleysville] will have the right and duty to defend the insured against any "suit" seeking those damages . . . .

(*Id.*, Commercial General Liability Coverage Form at 1.) The Policy also contains an exclusion for contractual liability, but carves out an exception for liability assumed in an "insured contract" as follows:

>2. Exclusions
>This insurance does not apply to: . . .
>b. Contractual Liability
>"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages: . . .
>(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability

3

>assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
>(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
>(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

(*Id.* at 2.) The Policy defines "insured contract" in a separate provision, which was later amended to state the following:

>9. "Insured contract" means: . . .
>f. That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

(*Id.*, General Liability Enhancement Endorsement at 4-5.)

**C.     Jonathan Hughes Litigation**

One of the employees that PDSI leased to Miller was Defendant Jonathan Hughes. (Reisbord Aff. ¶ 17, Ex. P at 2-3.) Hughes was assigned by PDSI to Miller's Nitro, West Virginia facility, to work as a tank washer.[1] (*See* Olson Dep. at 18-19.) On September 6, 2007, Hughes was injured while cleaning a tractor-trailer tank at Miller's facility. (*See* Robison Dep. at 29-31; Reisbord Aff. ¶ 3, Ex. B ("Hughes Dep.") at 66-67;

---

[1]     In addition to mechanics and tank washers, PDSI also leases supervisory personnel to Miller at the Nitro facility. (Robison Dep. at 49-50.) The managers are known as "lead men" and are responsible for the supervision of PDSI employees, while working in
(Footnote Continued on Next Page)

Reisbord Aff. ¶ 4, Ex. C ("Chapman Dep.") at 20.) On that date, Hughes assisted in the cleaning process by carrying a bucket of material back and forth between the platform and dump drum, a task which required ascending and descending a ladder. (Hughes Dep. at 66-67.)

The tanker Hughes was cleaning at the time of his injury was parked in Bay 2, one of the bays without fall protection. (*See* Reisbord Aff. ¶ 2, Ex. A ("Hughes Compl.") ¶ 8.) The general practice in Bay 2 was to utilize a stationary ladder in combination with a mobile A-frame ladder. (Hughes Dep. at 13-15; Chapman Dep. at 15-16.) Employees, such as Hughes, would ascend on a stationary ladder, but would transfer over to an A-frame ladder for the descent, grab the bucket of material, and then descend on the mobile ladder. (Hughes Dep. at 13-16; Chapman Dep. at 44-45.) Hughes's fall occurred on a descent from the tanker. (*See* Hughes Dep. at 66-67.) He had transferred from the fixed ladder to the A-frame ladder and was reaching for a bucket of material when he "lost his stability." (*Id.*) Hughes believes the ladder then "kick[ed] out" from under him, he proceeded to fall to the floor, and sustained several injuries. (*Id.*)

Following the incident, Hughes brought suit against Miller in the state courts of West Virginia. (*See, e.g.*, Hughes Compl.) In April 2011, Miller reached a settlement with Hughes. (*See* Resibord Aff. ¶ 23, Ex. V.) Hughes released Miller from liability in exchange for a payment of $300,000. (*See id.*; Doc. No. 39, Malone Decl. ¶ 11, Ex. 9.)

---

(Footnote Continued From Previous Page)
conjunction with Miller's managers. (*Id.* at 49-54; 84-85.)

Miller now seeks to recover that amount, along with $104,337 in attorney fees relating to its defense of the West Virginia action, for a total of $404,337.  (*See* Resibord Aff. ¶ 23, Ex. V.)

Harleysville initiated this action seeking a declaratory judgment.  Harleysville seeks a declaration that it is not required to indemnify Miller under the policy Harleysville issued to PDSI with respect to the West Virginia settlement involving Hughes.  (Compl. ¶¶ 20-22.)  PDSI cross-claimed against Miller (Doc. No. 6), and Miller counterclaimed against Harleysville (Doc. No. 10).  Harleysville, PDSI, and Miller have now all moved for summary judgment.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Insurance Coverage

All three motions for summary judgment seek a determination by the Court as to Harleysville's duty, if any, to provide coverage for Miller's settlement of the West Virginia action. Miller and PDSI contend that Harleysville must provide coverage to Miller as a result of the indemnification provision of the Agreement between Miller and PDSI, which, they maintain, qualifies as an "insured contract" under the Policy. In the alternative, Miller contends that it is entitled to judgment for PDSI's failure to name Miller as an additional insured under the Policy. The parties concede that no genuine factual disputes exist for purposes of the present motions. The outcome here turns instead on the interpretation of the Policy language, and the Court renders its decision based on its resolution of the question of law before it.

### A.     Indemnification

Miller asserts that it is entitled to indemnification from PDSI in light of the Agreement between them.  The indemnity provision of the Agreement between PDSI and Miller states, in relevant part, that PDSI "indemnifies and saves MILLER harmless from any and all claims, actions or causes of action in any way relating to personnel assigned to MILLER, including, but not limited to, personal injury, workers compensation, third party claims, Social Security, unemployment compensation, and taxes or other required withholding of whatever nature."  (Agreement ¶ 5.)

It is clear to the Court that Hughes was a PDSI employee assigned to Miller, and there is no dispute that the West Virginia action centered on a personal injury.  The parties also agree that the Agreement governed their relationship at the time of Hughes's injury.  Thus, the West Virginia lawsuit fell squarely within the indemnity provision of the Agreement between PDSI and Miller.  Consequently, the Court concludes that PDSI is obligated to indemnify Miller against its settlement of the West Virginia lawsuit.

Miller shall receive reimbursement for the $300,000 settlement amount.  Harleysville shall provide coverage for the settlement as discussed below.  The parties shall also negotiate, in good faith, the resolution of Miller's claim to $104,337 in attorney fees related to that action.[2]  If the parties are unable to resolve the issue within fourteen

---

[2]     The Court notes that the Policy deems "reasonable attorney fees and necessary litigation expenses" to be "damages because of 'bodily injury' or 'property damage.'"  (Policy, Commercial General Liability Coverage Form at 2.)

(14) days of the date of entry of this order, Miller shall file with the Court an affidavit of counsel, along with an itemized accounting of the costs and fees incurred in the West Virginia action for the Court's consideration.

### B.  Additional Insured

Miller also claims that it is entitled to judgment as a result of PDSI's failure to obtain a policy naming Miller "as an additional insured." (*See id.*)  Because the Court has determined that Miller is entitled to indemnification for the reasons articulated above, the Court need not reach the additional insured issue.

### C.  Insured Contract

Lastly, Miller and PDSI maintain that Harleysville is required to provide coverage for PDSI's indemnity obligations to Miller because the Agreement between Miller and PDSI constitutes an "insured contract" so as to fall within the exception to the contractual liability exclusion in the Policy.  The Policy defines "insured contract" as:

> That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, ***provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf***.

(Policy, General Liability Enhancement Endorsement at 4-5 (emphasis added).)

It appears to the Court that the Policy's prerequisite that an injury be "caused, in whole or in part, by [PDSI] or by those acting on [PDSI's] behalf" requires that there be a causal connection between the actions of PDSI (or those acting on PDSI's behalf) and Hughes's injuries in this case.  The Court does not construe the causal language of the

Policy as requiring anything more than "but for" causation. *See, e.g.*, *Faber v. Roelofs*, 250 N.W.2d 817, 822 (Minn. 1977). And clearly, but for PDSI's employment of Hughes as a tank cleaner at Miller's facility, and Hughes's descent of the ladder, Hughes would not have been injured. PDSI hired Hughes to perform the job, and Hughes undertook the act of descending from the ladder on the tanker, which then resulted in his fall. Therefore, Hughes's own actions at least partially caused his injuries.

It is also clear to the Court that the PDSI employees at the facility were "acting on [PDSI]'s behalf." Not only did Hughes act on PDSI's behalf in the course and scope of his employment, but the PDSI "lead man" at the facility also acted on behalf of PDSI in a supervisory capacity. (Reisbord Aff. ¶ 17, Ex. P at 3 ("PDSI was responsible for supervising Mr. Hughes.").) Even if neither Hughes nor PDSI were in any way liable for Hughes's injuries, their actions were certainly "but for" causes. PDSI was responsible for supervising Hughes, and the PDSI lead man was at least partially responsible for directing Hughes's day-to-day activities. (*See* Robison Dep. at 84-85.) Such management of PDSI employees included deciding, with Miller, which tanks were to be cleaned and overseeing the PDSI employees who performed the cleaning.[3] (*See id.*)

The Court finds that individuals acting on PDSI's behalf—including the "lead man" at the West Virginia facility in his supervisory role, and Hughes himself, by way of

---

[3]   The PDSI "lead man" at the Nitro, West Virginia facility would "interact with the people from Miller because Miller would have their own supervisors on-site to make sure that the jobs get done, who was assigned where, and to do what." (Robison Dep. at 49-50.)

his own actions—at least partially caused the bodily injury that Hughes sustained, as the term "caused" is construed by the Court for purposes of the Policy. Thus, the Court concludes that the tort liability assumed by PDSI in the indemnity provision of the Agreement between Miller and PDSI constitutes an "insured contract" as that term is defined by the Policy. Consequently, Harleysville is obligated to provide coverage for Miller's settlement of the West Virginia action.

No genuine issues of material fact exist with respect to the claims at issue. The Court concludes that PDSI and Miller are entitled to judgment in part as a matter of law, and Harleysville is not entitled to judgment on its claim for declaratory relief.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Harleysville's Motion for Summary Judgment (Doc. No. [27]) is **DENIED**.

2. Motion for Summary Judgment of Defendant PDSI (Doc. No. [31]) and Defendant Miller's Motion for Summary Judgment (Doc. No. [35]) are **GRANTED IN PART** as follows:

   a. PDSI is obligated to indemnify Miller for its settlement of the West Virginia action in the amount of $300,000.

   b. Harleysville is obligated to provide coverage for the settlement of the West Virginia action.

        c.      The parties shall negotiate, in good faith, resolution of Miller's claim for reimbursement of $104,337 in attorney fees. If the parties are unable to resolve the issue within fourteen (14) days of the date of entry of this order, Miller shall file with the Court an affidavit of counsel, along with an itemized accounting of the costs and fees incurred in the West Virginia action.

3.      Within fourteen (14) days of the date of entry of this order, the parties shall each indicate, in writing, whether by stipulation or by letter to the Court, their respective positions regarding the status of Defendant Jonathan Hughes as a party to this action.

Dated: January 30, 2012                        s/Donovan W. Frank
                                                      DONOVAN W. FRANK
                                                      United States District Judge